UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| WILLIAM D. BENSON | CIVIL ACTION |
| VERSUS | |
| DIAMOND OFFSHORE DRILLING, INC. | NO. 00-591-JJB |

**OPINION**

Plaintiff, William D. Benson, brings this claim against defendant, Diamond Offshore Drilling, Inc., for damages as a result of an injury sustained while performing work aboard Diamond's semi-submersible drilling rig, the "Ocean Concord." Judge Tyson held a three-day bench trial on this matter on November 17-19, 2003. Mr. Benson died on April 27, 2006 of a heart attack. Kendra Leanee Benson, Mr. Benson's widow, was properly substituted in the case. The Court is now ready to rule.[1]

**FINDINGS OF FACT**

Based on all the evidence and testimony presented at trial, as well as the parties' stipulations in the pretrial order, the Court makes the following findings of fact:

1. Plaintiff, William D. Benson (Mr. Benson), was employed as a seaman by defendant, Diamond Offshore Drilling, Inc. (Diamond), working on Diamond's semi-submersible drilling rig, the "Ocean Concord," in the capacity of a roustabout. Diamond and Diamond Offshore Management, Inc. owned the "Ocean Concord."

---

[1]The following ruling was written by Judge Ralph E. Tyson before his death.

The "Ocean Concord" was a vessel in navigation on the navigable waters of the Gulf of Mexico.

2. On January 22, 1998, Mr. Benson and a co-worker, Selwyn Moore (Mr. Moore), also employed as a roustabout, were assigned the task of palletizing two 4-inch long mud hoses, each hose at least 100 feet long. In order to palletizie the hoses, a crane was used to lift each hose up high and the crane operator would lower the hose for Mr. Benson and Mr. Moore to coil on to the pallet.

3. On the occasion in question, their supervisor, James Hastings (Mr. Hastings), performed the task of flag operator/signal person who would signal the crane operator, Neil Furr, on the appropriate navigation of the crane. A flag operator/signaler was necessary because a paint locker, which was located near the pallet used to roll the second hose, obstructed the view between the crane operator and Mr. Benson and Mr. Moore.

4. The hook sling attached to the headache ball was about 15 to 30 feet long. The headache ball was about 22' to 24' in diameter and weighed about 500 lbs. Mr. Benson and Mr. Moore successfully palletizied the first hose. While finishing up palletizing the second hose, Mr. Benson had his back to Mr. Hastings while putting the hose on the pallet. Mr. Benson was tucking the hose in when he was hit in the mid to lower back and knocked forward by the headache ball.

5. Mr. Moore, who was standing on the opposite side from Mr. Benson, heard Mr. Hastings say "look out," and Mr. Moore ducked. Neither Mr. Benson nor Mr. Moore expected or saw any reason for the headache ball to be lowered to a level where it could strike them.

6. Thereafter, Mr. Benson sought treatment at the Westbank Surgical Clinic with Dr. Howard A. Nelson Jr, on January 26, 1998. Dr. Nelson diagnosed Mr. Benson with a contusion to the "right lumbar and S1 areas" and "mild nerve root pressure signs" in the right lower extremity. Dr. Nelson prescribed as treatment heat and pain medication.

7. On February 1, 1998, Mr. Benson went to the emergency room of Rapides General Medical Center with the chief complaint of back pain. Mr. Benson was diagnosed with a lumbar muscle strain and contusions. Mr. Benson was prescribed pain medication as treatment.

8. On February 12, 1998, Mr. Benson began treatment with Dr. Vanda Davidson, an orthopaedic surgeon. Mr. Benson complained of back pain which traveled down the back of his right leg to his right heel with numbness and tingling in the toes of his right foot. Dr. Davidson diagnosed Mr. Benson with a strained back and some disc damage or aggravation of previous disc damage to the L4-5. Dr. Davidson prescribed pain medication as treatment. Dr. Davidson continued conservative treatment of Mr. Benson through March, 1998.

9. Since Mr. Benson was still complaining of back pain, on May 1, 1998, Dr. Davidson had Mr. Benson admitted to Rapides General Hospital for a herniated disc (shown on the April, 1998 CT scan), to get control of his pain and for traction on his

back. Dr. Davidson placed Mr. Benson on bed rest in the hospital and sought an evaluation for neurosurgery.

10. While in the hospital, Dr. Babson Fresh performed a neurosurgical evaluation on Mr. Benson and recommended epidural steriod injections as treatment. Mr. Benson began receiving epidural steriod injections, and in June 1998, Dr. Davidson's medical records reflect that Mr. Benson was receiving some pain relief as a result of the injections.

11. Dr. Davidson last saw Mr. Benson for treatment on June 4, 1998. At the time of his last examination, Dr. Davidson felt that Mr. Benson "had a high likelihood of needing surgery," but was uncertain as to what would be the best procedure to recommend.

12. On October 13, 1998, Mr. Benson did see Dr. Davidson for the purpose of getting Dr. Davidson's opinion as to diagnostic studies performed on Mr. Benson through another physician. Dr. Davidson reviewed an EMG nerve conduction study, CT scan and MRI. Dr. Davidson evaluated that he was concerned about Mr. Benson 's overall picture because he was having right-sided pain which was incompatible to the findings on the MRI and CT evaluation. He was having a lot of back pain and right leg pain, but the CT scan showed a disc at L4-5 bulging to the left which does not explain the right-sided leg pain. Dr. Davidson indicated that CT scan showed a far lateral protrusion, that could cause irritation to the L5 nerve root that would be consistent with right L5 pain. Dr. Davidson indicated that he would have wanted more information before recommending surgery on the L4-5.

13. On June 23, 1998, Mr. Benson was seen again in the emergency room of the Rapides General Medical Center with complaints of back pain. The emergency room doctor diagnosed him with chronic low back pain.

14. On July 2, 1998, Mr. Benson was examined by Dr. Chris Cenac (Dr. Cenac), Diamond's physician of choice. Dr. Cenac ordered an MRI and an EMG/NCS evaluation on Mr. Benson. After reviewing the evaluations, Dr. Cenac opined that Mr. Benson had "an aggravation of a pre-existing degenerative condition made symptomatic by the 1/23/98 accident." Dr. Cenac also opined that Mr. Benson had mechanical low back pain with no evidence of neurological dysfunction or a surgical lesion identified.

15. On July 21, 1998, Mr. Benson began treatment with Dr. Bruce Razza (Dr. Razza). Dr. Razza ordered further testing to evaluate Mr. Benson for surgical management. Dr. Razza ordered EMG nerve conduction studies on September 9, 1998, which in his opinion demonstrated objective evidence of right L5 nerve root pathology. Dr. Razza also ordered a CT Scan of the lumbar spine which demonstrated a right-sided disc herniation at L5-S1 and a small herniation on the left side at the L4-5. Also, an MRI was performed that, in Dr. Razza's opinion, confirmed two level disc herniations at the L4-5 and L5-S1. Based on his opinion of Mr. Benson's medical test, Dr. Razza recommended surgery. Mr. Benson elected the surgical procedure of bilateral partial lumbar laminectomies, decompression, fusion,

3

and internal fixation at L4 to the sacrum. Mr. Benson had this surgical procedure performed on January 27, 1999.

16. Dr. Cenac reviewed the MRI, CT scan, and EMG/NCS from September 9, 1998, and agreed that Mr. Benson should have lumbar laminectomy and decompression at the L4/5 on the left and L5-S1 on the right side. Dr. Cenac also felt that the need for surgery was causally related to the 1/23/98 incident.

17. Dr. Razza felt that the first surgery was partially successful, it did what it was supposed to do, but did not give Mr. Benson enough pain relief by itself. Dr. Razza, at this point, recommended a second surgery. On November 17, 1999, Dr. Razza performed the second surgery which was an anterior lumbar fusion and intervertebral cage fixation.

18. From May 1999 through October, 1999 and January, 2000 through March, 2000, Mr. Benson received treatment from Dr. Robert Rush, an occupational physician. Dr. Razza referred Mr. Benson to Dr. Rush for weight loss. Dr. Rush's objective was to help Mr. Benson lose weight because spinal fusion is more successful in patients who are not obesed.

19. Dr. James Quillin, a clinical psychologist, treated Mr. Benson for chronic pain and depression from August, 1999 through April, 2001.

20. Dr. Razza last saw Mr. Benson on June 5, 2001. Dr. Razza determined that the second surgery adequately stabilized Mr. Benson by review of a CT scan of the lumbar and a lumbar tomogram. Dr. Razza determined that these test showed that a good decompression of the entire operative levels, good fusion both anteriorly and posteriorly, and good location of the hardware with no evidence of any movement, migration, or loosening.

21. Following his second surgery, Mr. Benson continued to complain of pain. Dr. Razza referred Mr. Benson to Dr. Stephen P. Katz, a pain management specialist. Dr. Katz began treating Mr. Benson in June, 2001, and diagnosed Mr. Benson with "failed back syndrome" - continued discomfort after back surgery. Dr. Katz has continued and presently treats Mr. Benson with epidural steroid injections and several pain medications.

## **APPLICABLE LAW**

Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1333, which provides original jurisdiction over admiralty and maritime matters, and 46 U.S.C. App. § 688, the Jones Act, which provides jurisdiction over a claim by a seaman against his employer to recover damages for personal injuries sustained in

4

the course and scope of employment.

Law

Under the Jones Act, employers of seamen have a duty to provide their employees with a reasonably safe place to work.[2] Also, under the law applicable to this case, the seaman's employer is legally responsible for the negligence of one of its employees while the employee is acting in the course and scope of his job.[3]

In addition to his claim for negligence under the Jones Act, Mr. Benson also claims unseaworthiness against Diamond under the general maritime law. Under this law, Diamond, as owner of the M/V OCEAN CONCORD, owes a member of the crew such as Mr. Benson a duty to furnish a seaworthy ship.[4] The duty of seaworthiness is absolute, but "it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use."[5] This duty extends to the hull of the vessel, the vessel's cargo handling machinery, lines and tackle and all kinds of equipment either belonging to the vessel owner or brought aboard by others. The duty is reasonableness, not perfection. In order to establish unseaworthiness, the seaman must prove a causal connection between his injury and the breach of duty

---

[2] 1 **Schoenbaum, Admiralty and Maritime Law,** 319 (2d Ed. 1994).

[3] Gilmore & Black, **The Law of Admiralty** 277 (2nd Ed. 1975).

[4] **The Osceola,** 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760 (1903); **Mitchell v. Trawler Racer, Inc.,** 362 U.S. 539, 549, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960).

[5] Id. at 550.

5

that rendered the vessel unseaworthy.[6] The standard used to prove causation for unseaworthiness is more strict than the standard for a Jones Act claim of negligence.[7]

## **CONCLUSIONS OF LAW**

In the instant case, after hearing all of the testimony, observing the demeanor of the witnesses, reviewing the exhibits, and the record, the Court finds that Mr. Benson's injuries were proximately caused by the negligence of Diamond's employee. The record supports a finding that the January 22, 1998, accident was caused by the inattentiveness of Mr. Hastings in performing the task of signal man and permitting the headache ball to descend lower than necessary. Larry Robichaux (Mr. Robichaux), who was accepted as an expert in crane operations and rigging, testified that there was no need for the headache ball to descend to such a low level. Mr. Robichaux stated that the choker sling was about 20 feet long, and the headache ball should have stopped about 16-18 feet above the workers on deck, since Mr. Moore and Mr. Benson were just coiling the hose. Mr. Robichaux stated that the accident was caused by the inattentive signal man -- that the signal man did not stop the descending of the headache ball or the crane operator did not pay attention to the signal and stop the crane. Mr. Robichaux indicated that Mr. Benson was not at fault, and Mr. Benson was doing what he should have been doing at the

---

[6] **Jackson v. OMI Corp.,** 245 F.3d 525, 527 (5th Cir. 2001).

[7] **Comeaux v. T.L. James & Co., Inc.,** 702 F.2d 1023, 1025 (5th Cir. 1983).

time of the accident. Mr. Benson and Mr. Moore also testified that there was no reason for the headache ball to be lowered to a level where it could strike them.

The January 22, 1998, accident proximately caused Mr. Benson to sustain physical injuries. Drs. Davidson and Cenac agreed that Mr. Benson sustained a strained back and some disc damage or aggravation of previous disc damage to the L4-5. A later evaluation by Dr. Fresh, at the request of Dr. Davidson, resulted in a diagnosis of mechanical low back pain. At that time, Dr. Cenac agreed with Dr. Fresh's diagnosis. Drs. Davidson, Fresh and Cenac expressed some concern that Mr. Benson was having right-sided pain which was incompatible to the findings on the MRI and CT Scan which showed a bulging disc at the L4-5, bulging to the left side which would not explain Mr. Benson right-sided leg pain. However, Dr. Davidson did express that he felt that Mr. Benson had a high likelihood of needing surgery, but was uncertain as to what procedure to recommend without further testing.

Through subsequent treatment, Dr. Razza performed additional testing, which included an EMG nerve conduction studies, a CT Scan and MRI of the lumbar spine, and diagnosed Mr. Benson with right L5 nerve root pathology, a right-sided disc herniation at L5-S1 and a small herniation on the left side at the L4-5. Based on his diagnosis, Dr. Razza recommended surgery. After reviewing these tests, Dr. Cenac agreed with Dr. Razza's findings and recommendation for surgery. Dr. Cenac also opined that the need for surgery was causally related to the January 22, 1998,

7

accident. The court finds that Mr. Benson has set forth sufficient evidence to support a finding that the January 22, 1998, accident on the "Ocean Concord" proximately caused injuries to Mr. Benson's lumbar spine at the L4-5 on the left side and his L5-S1 on the right side. The court further finds that as a result of the accident, Mr. Benson had two back surgeries.

The record reflects that following the surgeries, Mr. Benson has continued to complain of back pain and the inability to work. His treating physicians disagree on the extent of Mr. Benson post-surgery diagnosis and recovery. Dr. Razza last saw Mr. Benson on June 5, 2001. At that time, Dr. Razza felt that Mr. Benson surgeries were successful. After having CT scan and lumbar tomogram tests performed on Mr. Benson, Dr. Razza determined that these tests showed good compression of the entire operative levels, good fusion both anteriorly and posteriorly, and good location of the hardware with no evidence of any movement, migration, or loosening.[8]

Dr. Razza felt that by his June 5, 2001 visit, Mr. Benson had reached maximum medical improvement for fusion consolidation.[9] Dr. Razza stated that as of his last visit, Mr. Benson was improved as far as the lumbar radiculopathy - no more low back pain radiating into the legs - but he still had some right-sided low back pain.[10] Dr. Razza diagnosed Mr. Benson with post-traumatic arthritis

---

[8] See Defendant's Exhibit 19, Dr. Razza's deposition excerpts, p. 28.

[9] Id. at p. 31.

[10] Id. at pp. 29-30.

8

syndrome.[11] Dr. Razza opined that by November, 2001, Mr. Benson would reach maximum medical improvement for total neurologic recovery.[12] Dr. Razza also felt that Mr. Benson could perform light duty and may be medium duty work. Dr. Razza set Mr. Benson's permanent restrictions to preclude repetitive bending, squatting, stooping, climbing, prolonged standing or sitting , and restricting repetitive lifting to the 15 to 20 pound range.[13] At trial, Dr. Cenac testified that he agreed with Dr. Razza's diagnosis and determinations as to Mr. Benson's maximum medical improvement.

Following Mr. Benson's two back surgeries, Dr. Katz began treating Mr. Benson in May, 2001. Dr. Katz was offered as an expert in pain management, but was not accepted as an expert by the court.[14] Dr. Katz diagnosed Mr. Benson with "failed back syndrome," which, according to Dr. Katz, means continued discomfort after back surgery. Dr. Katz treated Mr. Benson with pain medication. Dr. Katz was of the opinion that Mr. Benson could not return to work. Dr. Katz's opinion is in direct conflict with Dr. Razza's opinion. After considering and evaluating Dr. Katz's testimony, the court finds that Dr. Katz was not a credible witness and that this

---

[11] Id.

[12] Id. at 31-32.

[13] Id. at 29.

[14] The court based its decision exclude Dr. Katz as a expert witness on the following: Dr. Katz was not board certified in pain management, had never done a fellowship in pain management, never testified in court or been accepted as an expert, and has never been published.

9

testimony was contradictory and unbelievable.

For example, although Dr. Katz indicated on a Social Security Disability application that he had examined X-rays of Mr. Benson's back, at trial, Dr. Katz admitted that he never reviewed Mr. Benson's x-rays. Dr. Katz also completed a Capability Opinion of Treating Physician form for Social Security wherein Dr. Katz set forth Mr. Benson functional limitations. Dr. Katz admitted that he did not perform any functional capacity evaluation or any other testing, but simply filled out the Social Security form by putting in numbers based on what Dr. Katz felt was appropriate. At the time of filling out the Social Security form, Dr. Katz had only seen Mr. Benson on three occasions.

Another example is Dr. Katz's June 6, 2001 office visit with Mr. Benson. As previously mentioned, on June 5, 2001, Dr. Razza examined Mr. Benson and opined that Mr. Benson was "improved as far as the lumbar radiculopathy, that is, as far as low back radiating into the legs, but still had some right-sided low back pain."[15] The very next day, on June 6, 2001, at Mr. Benson's office visit with Dr. Katz, Mr. Benson was diagnosed with failed back syndrome. Dr. Katz admitted at trial, that the diagnosis was based on Mr. Benson giving a medical history of right lower back pain radiating into the right lower extremity. Dr. Katz explained that if a patient says he has pain then Dr. Katz takes the patient at face value. Dr. Katz stated that based on his examination of Mr. Benson, Dr. Katz felt that Mr. Benson still had right lower leg

---

[15] Defendant's Exhibit 19, pp. 29-30.

pain, even though Dr. Razza found otherwise.

In addition, the record reflects that Dr. Katz has prescribed numerous pain pills to Mr. Benson throughout Mr. Benson's treatment. The record shows that on several occasions, Mr. Benson was receiving prescription pain pills from Dr. Katz and other doctors at the same time. During his six years of treating Mr. Benson, Dr. Katz never sent Mr. Benson for a functional capacity evaluation. According to Mr. Benson, on office visits, Dr. Katz would inquire from Mr. Benson as to what was going on, and based on Mr. Benson response, Dr. Katz would prescribe pain medication. Mr. Benson stated that every once in awhile, Dr. Katz would push on Mr. Benson's back.

Considering all of the evidence, the court accepts the opinion of Dr. Razza as to when Mr. Benson reached maximum medical improvement and his determination that Mr. Benson would be able to perform light and maybe medium duty work as of November, 2001.

The court also find that Mr. Benson was not a credible witness with regard to his testimony on his pain following the accident and after the second back surgery as well as his ability to return to work. Mr. Benson testified that he is not able to work, and that he stills has back pain and spasms. Mr. Benson indicated that after the second surgery, he was not pain free, and that he had no significant improvement. Mr. Benson further indicated that he has trouble sleeping and usually just doses off in the early morning hours.

11

Mr. Benson's testimony was contradicted by a private investigator, Scott McLean, who was hired by Diamond and testified at trial. Mr. McLean testified that he followed and tape the activities of Mr. Benson on November 11, 2003. The tape was reviewed by the court and admitted into evidence. The tape shows Mr. Benson working in a convenience store as a cashier, shows him waiting on customers, reaching for items on the shelf, shows him leaning over on the counter, and resting on his hands with his elbows on the counter while talking to customers. According to Mr. McLean, Mr. Benson was at the store until 11:12 p.m. The video also shows Mr. Benson exiting the store, stepping off the curb, and sitting on the curb with his legs crossed Indian style for approximately 12 minutes while talking and smoking a cigarette.

When questioned about the video, Mr. Benson admitted that he was the individual on the video, but stated that he was not working in the store. Mr. Benson stated that he was doing a favor for a "good friend" but could only recall the first name of this good friend, "Mike." Mr. Benson stated that he was not working and did not get paid. After carefully considering all of the evidence, including the videotape, the court does not find Mr. Benson credible. In fact, the court does not believe any of Mr. Benson's testimony with regard to his pain and ability to work after the second surgery. Thus, the court concludes that Mr. Benson has failed to set forth sufficient evidence showing that after November, 2001, Mr. Benson was suffering with significant pain and was unable to work.

12

Case 3:00-cv-00591-JJB -CN   Document 144   08/26/11   Page 12 of 20

DAMAGES

Under the Jones Act and general maritime law, monetary recovery is allowed for loss of earning capacity, medical expenses, and pain and suffering resulting from an injury caused by negligence and/or unseaworthiness.[16] At the time of trial, Mr. Benson was forty-three (43) years old. His work-life expectancy was thirty-three (33) years. He began his career in the offshore industry in May, 1997, as a roustabout. He was working in the position of roustabout until his January 22, 1998, accident. Mr. Benson's previous employment consisted of construction work and truck driving. According to Dr. Randy Rice, who was accepted as an expert in economics, plaintiff's annual income with Diamond was $23,550.07. There was no testimony disputing this amount of annual income.

Lost Wages (January 22, 1998 - November 1, 2001)

Regarding past loss wages, the court has previously concluded that as of November, 2001, plaintiff had reached maximum medical improvement and could have returned to some type of employment. Based on this, Dr. Rice calculated plaintiff's past loss earnings from the time of his accident until November, 2001 at $81,042.00. Dan Cliffe, a certified public accountant, who testified as an expert in economic loss on behalf of Diamond, calculated Mr. Benson's past loss wages in the amount of $75,700.00. Mr. Cliffe explained the difference between his figure and Dr. Rice's figure was that Mr. Cliffe used a different discount rate. Mr. Cliffe offered no

---

[16] **Schoenbaum, Admiralty and Maritime Law** § 5-15, at 234.

13

explanation for why he used a different discount figure. Thus, the court finds that plaintiff is entitled to past loss wages in the amount of $81,042.00.[17]

Past Medical Expenses

At trial, on behalf of Mr. Benson, the following medical expenses were presented as unpaid medical expenses related to Mr. Benson's injury: Dr. Robert Rush's medical bill (Plaintiff's Exhibit 25), $1,475; Dr. Daniel Trahant's medical bill (Plaintiff's Exhibit 26), $235.00; Acadian Ambulance's bill (Plaintiff's Exhibit 27), $453.00; Acadian Ambulance's bill (Plaintiff's Exhibit 28), $262.00; Dr. Charles Aprill's medical bill (Plaintiff's Exhibit 29), $850; Dr. Charles Aprill's medical bill (Plaintiff's Exhibit 30), $595.00; Eckerd Drug's bill (Plaintiff's Exhibit 32), $300.66; and Sentry Drugs bill, $23,957.77 (Plaintiff's Exhibit 33).[18] Diamond's counsel indicated at trial, that if Plaintiff's Exhibits 26, 29, 30 and 32 were unpaid, then Diamond would pay these bills. Since Diamond acknowledged owing these medical

---

[17] Judge Tyson found that Plaintiff was entitled to damages for loss of future wages (from November 2, 2001 until the end of his expected working career) in the amount of $32,056. As Mr. Benson died on April 27, 2006, this amount must be recalculated to reflect this. Parties are ordered to submit briefs to the Court within thirty (30) days of this opinion on the issue of lost wages from November 2, 2001 until Mr. Benson's death on April 27, 2006.

[18] At trial, Mr. Benson also submitted as an unpaid medical bill in the amount of $47,599.30 from Doctor's Hospital of Jefferson (Plaintiff's Exhibit 21). Diamond had refused to pay this amount because an audit determined overcharges of $47,599.30. Subsequent to the trial, in Diamond's post trial memorandum, Diamond stated that Diamond and Doctor's Hospital of Jefferson had settled the matter and Doctor's Hospital were in the process of dismissing their suit against Mr. Benson. Diamond submitted as evidence (Exhibit A) copies of documents showing Doctor's Hospital of Jefferson intention to dismiss their suit against Mr. Benson. Thus, the court does not find it necessary to make an award on this medical bill.

14

expenses, the court will award Mr. Benson payment for Exhibits 26, 29, 30, and 32.

On behalf of Diamond, David Ellinburg, Diamond's claims manager, testified that with regard to Dr. Rush's medical bill, Diamond asserted that Dr. Rush was a doctor for weight loss, and this treatment is not part of "cure" under "maintenance and cure." Dr. Razza testified that he referred Mr. Benson to Dr. Rush for weigh loss because weigh loss was helpful in successful recovery from back surgery. The court finds that this medical expense was reasonably related to Mr. Benson's treatment for his back injury. Thus, the court finds that Mr. Benson is entitled to an award for this medical expense. Mr. Ellingburg testified that the Acadian Ambulance bills were not paid because Mr. Benson failed to get any preauthorization and provided no explanation why an ambulance was necessary. Mr. Benson testified that after the January 27th surgery, he felt like "something popped" or "locked up" in his back and wanted to get it checked out, so he went to the hospital by ambulance. The court finds that this medical expense is reasonably related to Mr. Benson's injury, and that Mr. Benson is entitled to an award for this medical expense.

With regard to the Sentry Drug bill (Exhibit 33), Mr. Ellingburg testified that Diamond never received this bill, and Diamond would not pay this because it was not part of Diamond's obligation under "cure." In reviewing Sentry Drug bill, the court finds the majority of the bill is related to prescriptions for pain medication. Having found that Mr. Benson's testimony on his level of pain was unbelievable, the court finds insufficient evidence to make an adequate determination as to Mr. Benson's

15

level of pain and the amount of pain medication legitimately prescribed.  Therefore, Mr. Benson is not entitled to an award for the Sentry Drug bill.   Considering the above, the court finds that Mr. Benson is entitled to past medical expenses in the amount of $4.170.66.

Pain and Suffering

Under both the Jones Act (negligence) as well as the General Maritime Law (unseaworthiness), a seaman is entitled to seek damages for past, present and future pain and suffering resulting from an employer-vessel owner's "fault".[19] In this case, Mr. Benson has suffered physical pain associated with his injury, two surgeries, and recovery. Mr. Benson testified that he has back pain, back spasms, cannot rest, and does not fall asleep until early morning.  Mr. Benson also testified that he had trouble getting comfortable.  Mr. Benson felt that after the surgeries, he did not have any significant level of change in his amount of pain and was still unable to work.  However, as previously noted, the court has reviewed a videotape of Mr. Benson which clearly shows him working in a convenience store. Considering the court's previous finding that Mr. Benson's testimony about the extent of his pain and suffering and ability to work were not credible, the court does not find that Mr. Benson is entitled to any damages for pain and suffering after November, 2001 because he failed to present credible evidence warranting a finding of damages for

---

[19] 2 **Norris, Law of Seamen**, § 30:41 (4th Ed.1989); 1 B. Benedict, **Admiralty**, *§* 32 (7th Ed.1994)

Case 3:00-cv-00591-JJB -CN   Document 144   08/26/11   Page 16 of 20

pain and suffering beyond that date. Thus, considering Mr. Benson's injury, surgeries, and recovery, the court finds that Mr. Benson is entitled to damages in the amount of $100,000 for past pain and suffering.

Maintenance and Cure

Mr. Benson seeks maintenance and cure. Mr. Benson alleges that maintenance and cure were terminated in the Spring of 2003. "A seaman's right to maintenance and cure is implicit in the contractual relationship between the seaman and his employer, and is designed to ensure the recovery of these individuals upon injury or sickness sustained in the service of the ship."[20] "Maintenance is Per diem living allowance, paid so long as the seaman is outside the hospital and has not reached the point of 'maximum cure.' Cure involves the payment of therapeutic, medical and hospital expenses not otherwise furnished to the seaman, again, until the point of 'maximum cure'.[21] "The accepted legal standard holds that maximum cure is achieved when it appears probable that further treatment will result in no Betterment of the seaman's condition."[22] When it is determined that the seaman's condition is incurable or that future treatment will only relieve pain and suffering but

---

[20] **Pelotto v. L & N Towing Company,** 604 F.2d 396, 400 (5th Cir. 1979) citing **Calmar S.S. Corp. v. Taylor,** 1938, 303 U.S. 525, 58 S.Ct. 651, 82 L.Ed.2d 993, 1938 A.M.C. 341; **Harden v. Gordon, C.C.D.Me.,** 1823, 11 Fed.Cas. 480, Cas. 6,047.

[21] **Id.** citing **Farrell v. United States,** 1949, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850, 1949 A.M.C. 613.

[22] **Id.** citing **Farrell v. U.S.,** 1949, 336 U.S. 511, 69 S.Ct. 707, 93 L.Ed. 850, 1949 A.M.C. 613.

not improve the seaman's physical condition, then it is appropriate to decide that the point of maximum cure has been obtained.[23]

Applying the applicable law to the case at hand, the court finds that Mr. Benson has failed to present any evidence showing that he is still entitled to maintenance and cure. In fact, the testimony before the court shows that Mr. Benson has obtained maximum cure. Both Dr. Razza and Dr. Cenac opined that by November, 2001, Mr. Benson was at maximum medical improvement and able to return to light or maybe medium duty work. Although the court found Dr. Katz's testimony not credible, Dr. Katz was only providing treatment to manage Mr. Benson's pain. Thus, the court finds that Mr. Benson is not entitled to an award for maintenance and cure.

Prejudgment Interest

Mr. Benson also seeks pre-judgment interest. Pursuant to maritime law, the awarding of pre-judgment interest is the rule rather than the exception, and, in practice, well-nigh automatic."[24] This rule applies equally to Jones Act claims brought under the Court's admiralty jurisdiction.[25] The trial court only has the discretion to deny prejudgment interest where the peculiar circumstances would make such an

---

[23] **Stewart v. Waterman S.S. Corp,** E.D.La., 1968, 288 F.Supp. 629, affirmed, 5th Cir., 1969, 409 F.2d 1045, 1969 A.M.C. 1648, cert. denied, 1970, 397 U.S. 1011, 90 S.Ct. 1239, 5 L.Ed.2d 423.

[24] **Reeled Tubing, Inc. v. M/V CHAD G,** 794 F.2d 1026, 1028 (5th Cir. 1986).

[25] **Williams v. Reading & Bates Drilling Co.,** 750 F.2d 487, 490 (5th Cir. 1985).

award inequitable.[26] The Fifth Circuit usually awards pre-judgment interest from the date of the loss to ensure that the injured plaintiff is compensated for the use of funds to which the plaintiff is entitled, but which the defendant had use of prior to the judgment.[27] The court also has broad discretion in setting the rate of pre-judgment interest.[28] The Fifth Circuit has approved taking into consideration the equities involved, application of the rate prevailing under 28 U.S.C. § 1961 at the time the loss occurred. The court takes judicial notice of the prevailing rate for January 6, 1998, about three weeks before the January 27, 1998 accident, and finds that the most equitable rate of prejudgment interest would be 5.341%.[29] Accordingly, the court finds and awards on all past damages accrued through the entry of Judgment pre-judgment interest to run at 5.341%.

Accordingly, on the basis of the foregoing Findings of Fact and Conclusions of Law, the court finds that the plaintiff has sustained damages due to the negligence of the defendant, Diamond. Thus,

JUDGMENT WILL BE ENTERED in favor of Plaintiff and against Defendant as follows:

    (1) Lost wages (January 22, 1998 - November 1, 2001):    $81,042

---

[26] **Id.** at 490.

[27] **Reeled Tubing, Inc.,** 794 F.2d at 1028.

[28] **Reeled Tubing, Inc.,** 794 F.2d at 1028.

[29] 28 U.S.C. § 1961.

(2) Past Medical Expense:     $4,170.66
(3) Past pain and suffering:  $100,000


NO AWARD will be made to plaintiff for damages for Maintenance and Cure and Future Pain and Suffering.

PLAINTIFF IS ENTITLED to prejudgment interest at the rate of 5.341%.

IT IS ORDERED that the parties submit briefs to the Court on the issue of calculating the amount of lost wages between November 2, 2001 and April 27, 2006 within thirty (30) days of this opinion.

Baton Rouge, Louisiana, August 26, 2011.

_____
JAMES J. BRADY, JUDGE
MIDDLE DISTRICT OF LOUISIANA